08-6067-cv
Macey v. Carolina Casualty Insurance Co.

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term, 2009

(Argued: August 28, 2009    Decided: June 30, 2010    Amended: March 23, 2012)

Docket No. 08-6067-cv

M. WILLIAM MACEY JR., CHARLES W. SANTORO AND HARRIET WEISS TERBELL,

   *Plaintiffs-Appellant*s,

   v.

CAROLINA CASUALTY INSURANCE COMPANY,

   *Defendant-Appellee*.

Before: KATZMANN and HALL, *Circuit Judges*, and KORMAN, *District Judge*.[*]

Plaintiff-Appellants M. William Macey *et al.* appeal from the November 14, 2008

memorandum of decision of the United States District Court for the District of Connecticut

(Mark R. Kravitz, *Judge*) granting summary judgment to Defendant-Appellee Carolina Casualty

Insurance Company.  We find the directors and officers insurance policy at issue to be

ambiguous under Virginia law, and therefore VACATE and REMAND to the district court for

further proceedings.

_____

[*] The Honorable Edward R. Korman, United States District Judge for the Eastern District
of New York, sitting by designation.

PETER B. SCHALK (Judd Burstein, *on the brief*) Judd Burstein, P.C., New York, New York, *for Plaintiffs-Appellants*.

DANIEL E. TRANEN (Douglas M. Connors, *on the brief*) Wilson Elser Moskowitz Edelman & Dicker LLP, Chicago, Illinois, *for Defendant-Appellee*.

PER CURIAM:

Plaintiffs-Appellants M. William Macey Jr. *et al.* appeal from the November 14, 2008 memorandum of decision of the United States District Court for the District of Connecticut (Mark R. Kravitz, *Judge*), granting summary judgment to Defendant-Appellee Carolina Casualty Insurance Company. The district court determined the relevant provisions of the directors and officers insurance policy were unambiguous in denial of coverage to the plaintiffs-appellants and granted the defendant summary judgment. We determine that the relevant policy provisions are capable of two reasonable interpretations and thus, under Virginia law, are ambiguous. We vacate the judgment of the district court and remand for further proceedings consistent with this opinion.

## Background

Prior to May 2004, Community Research Associates ("CRA") was incorporated in Illinois and, as relevant to this case, controlled by former directors and officers Doyle Wood, James Brown, and Allen Cole (the "Legacy Shareholders"). In May 2004, the former CRA-Illinois underwent a reorganization which involved, *inter alia*, changing its state of incorporation from Illinois to Delaware, and effectuating a stock purchase agreement by which Sterling Investment Partners ("Sterling") became the majority shareholder in the newly reorganized

entity.[1]  Pursuant to that agreement, Sterling was permitted to nominate up to six individuals for the board of directors, including, once the original Chief Executive Officer of CRA-Delaware stepped down, the Chairman of the Board of Directors.  In negotiations with Sterling, the Legacy Shareholders agreed to become minority shareholders in CRA-Delaware after the merger was complete and new board members were appointed.

The closing date of the merger was May 3, 2004 at 10:00 am.  The Share Purchase Agreement (the "Agreement") expressly listed CRA-Illinois and CRA-Delaware as parties to the merger, "with CRA Delaware as the surviving corporation."  Under the Agreement, which set out the terms of the merger, "[t]he closing of the purchase and sale of the Purchased Shares . . . and the redemption" of those same shares would occur "simultaneously with the execution and delivery of [the] Agreement."  Several other events occurred simultaneously at the time of the closing, including Brown, Wood, and Cole's assumption of positions as officers or directors of CRA-Delaware in order to sign the paperwork to complete the reorganization plan. *Macey v. Carolina Cas. Ins. Co.*, 585 F. Supp. 2d 277, 278 (D. Conn. 2008).  Article VII of the Agreement, titled Conditions to Obligation to Close, listed as a requirement that Brown and Wood resign from their positions as directors of CRA-Delaware in order to close the merger. The Stockholders' Agreement designated two of the appellants, Charles Santoro and M. William Macey, Jr., along with Bruce M. Lawlor, as the initial directors of CRA-Delaware, effective as of May 3, 2004.  Harriet Weiss Terbell, also one of the appellants, joined the board of directors later.  After the merger, the Legacy Shareholders became minority shareholders in CRA-

---

[1] For ease of reference, we refer to the pre-reorganization entity as "CRA-Illinois" and the post-reorganization entity as "CRA-Delaware."

3

Delaware and held no positions on the board or in upper management. Local Rule 56(a).1 Statement, ¶ 7.

**The Insurance Policy and Relevant Provisions**

In October 2004, CRA-Delaware purchased a Management Liability Insurance Policy (the "Policy") from Carolina Casualty Insurance Company ("Carolina"). On the Policy Proposal Form it provided to Carolina, CRA-Delaware made the following statement:

> On May 3, 2004 the company had a merger with an investment entity. A new Chairman and Chief Executive Officer was installed. The prior ownership remained in a minority capacity but were no longer participants on the Board or officers of the corporation. On August 2, 2004 a Chief Financial Officer was hired.

The Policy Proposal Form and "material submitted herewith," including the above statement, were incorporated into the final Policy in several places.

> First, the Policy Proposal Form acknowledged:

> The undersigned agree that the particulars and statements contained in the Proposal Form and any material submitted herewith are their representations and that they are material and are the basis of the insurance contract. The undersigned further agree that the Proposal Form and any material submitted herewith shall be considered attached to and a part of the Policy.

Second, in the Policy itself there were additional statements of inclusion of the Policy Proposal Form and submitted materials. The definition section included the word "Proposal" and defined it as "the Proposal Form and any material submitted therewith." The General Agreements section provided that "[b]y acceptance of this Policy, the insureds and the insurer agree that this Policy (including the Proposal) and any written endorsements attached hereto constitute the entire agreement between the parties." Finally, the Declarations Page also stated that "[t]hese Declarations along with the completed and signed Proposal Form and the Management Liability Insurance Policy, shall constitute the contract between the Insureds and the Insurer." The Policy

4

Proposal Form, because of its explicit incorporation within the Policy, thus became a part of the Policy.

The Policy proposed to cover claims made against CRA-Delaware directors and officers for "any Wrongful Act," including a breach of fiduciary duty. *Macey*, 585 F. Supp. 2d at 279. The coverage was limited by certain exclusions, including a clause commonly referred to as an "insured vs. insured" exclusion. Such an exclusion applied to claims "by, on behalf of, or in the right of the Insured Entity, or by any Directors or Officers." J. Appendix at 30. "Director(s) or Officer(s)" were further defined in the Policy as "any past, present or future duly elected or appointed directors or officers of the Insured Entity." J. Appendix at 27. The Policy identified CRA-Delaware, located in Alexandria, Virginia, as the insured entity and provided coverage for claims from October 10, 2004 through October 10, 2005. *Macey*, 585 F. Supp. 2d at 279.

In August 2005, the appellants approved a merger whereby all of CRA-Delaware's stock was sold to a third party named CRA Acquisitions Corp. After this merger, neither the Legacy Shareholders nor the appellants had any ownership interest in or control over CRA-Delaware. *Macey*, 585 F. Supp. 2d at 279. The Legacy Shareholders filed a lawsuit against appellants alleging a breach of fiduciary duty surrounding the August 2005 merger, ultimately settling the lawsuit for $3 million. *Macey*, 585 F. Supp. 2d at 279. Appellants then filed a claim under the Policy, asserting a loss stemming from the Legacy Shareholder's lawsuit. Carolina denied coverage for the appellants, citing the "insured vs. insured" exclusionary clause. This lawsuit followed.

5

**District Court Decision and Appeal**

In its decision granting summary judgment to Carolina, the district court interpreted the Policy under Virginia law, as the parties agreed, and held that the "insured vs. insured" exclusionary clause was unambiguous in denying coverage to the plaintiffs. *Macey*, 585 F. Supp. 2d at 280. The Legacy Shareholders were all former directors or officers of CRA-Delaware, having assumed those roles in order to effectuate the merger closing, and thus they were within the Policy's exclusion for losses from a lawsuit by the insured entity's directors or officers. *Id.*

In its ruling on the Motion for Reconsideration, the district court assured the plaintiffs that it did consider the Policy Proposal Form in its decision. *Macey v. Carolina Casualty Ins. Co.*, 3:06 CV 1719 (D. Conn. Jan. 14, 2009). The court did not mention the Form in its original decision, however, stating: "[I]t did not affect how the Court interpreted the insurance policy. Contrary to Plaintiffs' protestations, the language in the Policy Proposal Form is perfectly consistent with the conclusion that the Legacy Shareholders were former directors and/or officers under the Carolina policy." *Id.*

On appeal, appellants argue to this Court that the insured entity, CRA-Delaware, only began its existence on May 3, 2004 at 10:00 am after the closing of the Agreement with Sterling. The district court erred, according to appellants, in examining the "insured vs. insured" exclusion clause in a vacuum without considering the entirety of the Policy. The appellants also argue that the Legacy Shareholders "could not have been duly appointed or elected Directors or Officers of an entity that did not yet exist." And, merely because the Legacy Shareholders served as "titular" directors and officers, "should not qualify them as Directors and Officers

6

under the Policy," especially when the paperwork explains that their resignations were required and effective as of the closing of the merger, the event that arguably brought into existence the insured entity.

Carolina responds by arguing that although the CRA under discussion was incorporated in Delaware, the Legacy Shareholders were necessarily former officers or directors because they were appointed to be the initial directors of CRA-Delaware, regardless of when the official stock sale occurred. In particular, Carolina asserts that CRA-Delaware was established first; subsequently, a number of resolutions passed to allow stock issuance; and only then was there a final sale of the CRA-Delaware stock to Sterling. The Legacy Shareholders served on the CRA-Delaware board long enough for the resolutions to be passed, and therefore the Policy properly excluded coverage on lawsuits filed by them against the current board.

## DISCUSSION

**Standard of Review**

We review *de novo* a district court's grant of summary judgment, viewing all facts in a light most favorable to the non-moving party. *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 113 (2d Cir. 2005). Both parties agree that Virginia law controls our interpretation of the Policy.[2]

*Macey*, 585 F. Supp. 2d at 280.

---

[2] Original jurisdiction for this case lay with the United States District Court for the District of Connecticut under 28 U.S.C. § 1332, diversity jurisdiction. CRA-Delaware, although incorporated in Delaware, has its principal place of business in Virginia, and the parties agreed to the application of Virginia law to this lawsuit.

7

**Contract Interpretation under Virginia Law**

Under Virginia law, courts interpret insurance policies as they do all contracts, "with the intention of the parties gleaned from the words they have used in the document." *Seals v. Erie Ins. Exch.*, 674 S.E.2d 860, 862 (Va. 2009) (quoting *Floyd v. N. Neck Ins. Co.*, 427 S.E.2d 193, 196 (Va. 1993)). Insurance policies are read in their entirety. "Each phrase and clause of an insurance contract should be considered and construed together and seemingly conflicting provisions harmonized when that can be reasonably done, so as to effectuate the intention of the parties as expressed therein." *Id.* (quoting *Floyd*, 427 S.E.2d at 196).

> When a contract is complete on its face and is plain and unambiguous in its terms, a court is not free to search for its meaning beyond the contract itself. When a contract is ambiguous, however, a court should resort to parol evidence to ascertain the true intention of the parties. An ambiguity is defined as <u>the condition of admitting of two or more meanings, of being understood in more than one way, or of referring to two or more things at the same time.</u>

*Aetna Cas. & Surety Co. v. Fireguard Corp.*, 455 S.E.2d 229, 232 (Va. 1995) (internal quotation marks and citations omitted) (emphasis added).

The Virginia Supreme Court has explained that a contract ambiguity exists "when the contract's language is of doubtful import, is susceptible of being understood in more than one way or of having more than one meaning, or refers to two or more things at the same time." *Va. Elec. & Power Co. v. Norfolk S. Ry. Co.*, 683 S.E.2d 517, 526 (Va. 2009). An ambiguity may be patent, where "the language of the contract itself reveals that it can be interpreted in more than one way" or it may be latent, where although the contract may be clear at the time it is "formed, because of subsequently discovered or developed facts, [it] may reasonably be interpreted in either of two ways." *Id.* (internal quotation marks omitted).

8

Once a contract is deemed ambiguous, courts may turn to extrinsic evidence to determine the meaning behind it. *See Cascades N. Venture Ltd. P'Ship v. PRC Inc.*, 457 S.E.2d 370, 373 (Va. 1995). Recognizing that insurance companies, rather than policyholders, tend to draft the actual policy, as in many other states, courts in Virginia "have been consistent in construing the language of such policies, where there is doubt as to their meaning, in favor of that interpretation which grants coverage, rather than that which withholds it." *Seals*, 674 S.E.2d at 862 (quoting *St. Paul Fire & Marine Ins. Co. v. Nusbaum & Co.*, 316 S.E.2d 734, 736 (Va. 1984)). If there are two possible constructions of a policy provision, the "most favorable to the insured will be adopted. Language in a policy purporting to exclude certain events from coverage will be construed most strongly against the insurer." *Id.* (quoting *St. Paul Fire & Marine Ins. Co.*, 316 S.E.2d at 736).

**The Policy is Ambiguous**

Although the district court found that the Legacy Shareholders were former directors of CRA-Delaware because they "briefly assumed the position of officers and/or directors of CRA-Delaware in order to effectuate the reorganization plan," that statement appears to assume the answer without addressing the parties' arguments. Appellants argue that CRA-Delaware did not exist as an entity until the closing of the merger. At the very least, the question should have gone to a jury to determine whether CRA-Delaware existed prior to the merger or, if it did, whether it was the same entity that existed after the merger for purposes of policy coverage.

Virginia law determines that an ambiguity exists "when language admits of being understood in more than one way." *Golding v. Floyd*, 539 S.E.2d 735, 737 (Va. 2001) (internal quotation marks omitted). If the language of the Policy as a whole, which includes the Policy

9

Proposal Form, is capable of being understood multiple ways, then it is ambiguous. We hold that the Policy, when read in its entirety, can reasonably be "understood in more than one way" and is thus ambiguous.

The parties' opposing arguments are both reasonable interpretations of the Policy concerning whether the Legacy Shareholders were past directors or officers of CRA-Delaware and, accordingly, whether they appropriately fall within the "insured vs. insured" exclusionary clause. Pursuant to the Policy Proposal Form, the appellants argue that when CRA-Illinois merged with CRA-Delaware, the Legacy Shareholders became resulting minority owners of the surviving CRA-Delaware, but were neither participants on its board nor officers of that corporation to the extent intended to be encompassed within the Policy's "insured v. insured" exclusion. Conversely, based on its alternate reading of the same language, Carolina argues that the Legacy Shareholders were at one time former directors and officers of CRA-Delaware because the Policy Proposal Form states they are "no longer participants on the board or officers of the corporation." Furthermore, Carolina asserts that the Policy does not indicate when the Legacy Shareholders ceased to "participate," or more precisely ceased to be duly elected or appointed directors or officers. Both of these interpretations rely only on the language of the Policy, and either one is reasonable in light of the Policy's various provisions.

Both parties have pointed the Court to several places in the record to demonstrate parol evidence support for their respective positions. While we have examined the record in response, we decline to undertake fact finding in the first instance to decide which interpretation should apply in the final analysis. *See Garza v. Marine Transp. Lines, Inc.*, 861 F.2d 23, 24 (2d Cir. 1988) ("We do not pass on the proper interpretation of the disputed contract clauses because we

10

believe the district court should have the first opportunity to assess these clauses in light of the parol evidence introduced."). It is the responsibility of the trier of fact, once a writing is determined to be ambiguous, to "receive extrinsic evidence to ascertain the intention of the parties and to establish the real contract between them." *Cascades N. Venture Ltd. P'Ship*, 457 S.E.2d at 373. Likewise, our Court has determined that where extrinsic evidence may be properly considered, "the meaning of the ambiguous contract is a question of fact for the factfinder." *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009). For these reasons, we remand this case to the district court to undertake any additional fact finding and to interpret the Policy provisions in light of the facts to be found.

Appellees also argue that the appellants did not suffer any actual out-of-pocket monetary damages because of the underlying lawsuit. The district court did not address this argument in its decision. As this Court generally "will not review an issue the district court did not decide," we leave it to the district court to address it in further proceedings. *Colavito v. N.Y. Organ Donor Network, Inc.*, 486 F.3d 78, 80 (2d Cir. 2007).

**Conclusion**

We hold that the Policy at issue is ambiguous with respect to whether suits by certain Legacy Shareholders in this case are excluded from coverage by the "insured vs. insured" provision of the Policy. Because it is necessary to consider parol evidence bearing on the interpretation of this policy provision we vacate the judgment and remand this case to the district court for further proceedings consistent with this opinion.

11