# CIRCUIT COURT OF ORANGE COUNTY

Kent C. Higginbotham et al.

v.

Hartford Casualty
Insurance Co. et al.

January 29, 2010

Case No. CL07-000190

BY JUDGE DANIEL R. BOUTON

I set forth below the rulings of the court on some of the disputed issues in the above referenced case.

*Procedural Posture of the Case*

The plaintiffs in this case seek relief in the form of declaratory judgment; the matter was tried before the court on December 10, 2009. The evidence consisted of multiple exhibits, several factual stipulations, and the testimony of a number of witnesses. Prior to the commencement of the trial, all of the attorneys submitted briefs and memoranda in support of their respective positions. After the trial was completed, counsel also submitted their final arguments in written form. The court took the case under advisement in order to evaluate further the evidence and the relevant principles of law.

At this point, the court has not yet ruled on the issue of whether Hartford is precluded from denying coverage based on the estoppel/waiver arguments that have been presented. This issue will require additional study and reflection by the court. Nevertheless, the other rulings have been completed, and they will have a direct and critical impact on the status of the case that is pending for trial on March 17, 2010. Therefore, the court finds that it is both necessary and appropriate to announce at this time the rulings that are set forth below.

### I. Issue One: The Dispute Regarding the Duty of Firemen's to Defend or Indemnify

#### A. Relevant Facts

Lolita Sawyer was injured in a fall that took place in the parking lot of business premises that are owned by Orange Industrial Park, Inc. The date of the incident was December 13, 2002. At the time that she was injured, Ms. Sawyer was an employee of A B & C Group, Inc. This entity was a tenant of Orange Industrial Park, Inc. Pursuant to a written agreement, A B & C Group, Inc., leased a portion of the premises of Orange Industrial Park, Inc. The property where the fall occurred is known as the Old American Silk Mill property. It is owned, operated, and managed by Orange Industrial Park, Inc.

Mr. Kent C. Higginbotham is the president and the registered agent of Orange Industrial Park, Inc. Mr. Higginbotham is a gentleman who is well educated, extremely articulate, and very intelligent. He is actively involved in the business operations that are conducted on the property where the accident occurred. He is frequently on the premises and is well informed on all matters that occur in connection with Orange Industrial Park, Inc.

Over the course of the events that gave rise to the dispute before the court, Mr. Higginbotham never suffered from any injury, sickness, health problem, or disability that would have affected his ability to conduct business or to respond to any matters that pertain to this case. During this period of time, he was never inaccessible, nor was he absent from Orange County.

On July 7, 2003, Mr. Higginbotham received a letter from an attorney named Fletcher W. Harkrader, Jr. Among other things, the letter stated that Mr. Harkrader had been retained by Lolita Sawyer and that Ms. Sawyer had suffered a fall on the ice at a building owned by Kent

Higginbotham. The letter informed Mr. Higginbotham that the date of the incident was December 13, 2002. Mr. Harkrader requested that Mr. Higginbotham forward the letter to his insurance carrier. Mr. Harkrader advised Mr. Higginbotham that his failure to do this could mean a denial of insurance coverage. Finally, Mr. Harkrader asked Mr. Higginbotham to contact him to discuss a settlement in the event that he did not have any insurance to cover the claim.

Mr. Higginbotham admitted that he received and read this letter shortly after it was sent to him. He also conceded that he did not respond to Mr. Harkrader and that he did not deliver the letter to his insurance carrier. Based on his subjective opinion that the claim had no merit, he chose to ignore the letter.

On December 4, 2003, a second letter was sent to Mr. Higginbotham regarding the incident of December 13, 2002. This letter was sent to him from an attorney named William P. Hansen, Jr. Mr. Higginbotham received and reviewed this letter on a timely basis. This second letter also told Mr. Higginbotham that Lolita Sawyer had suffered injuries on December 13, 2002, when she fell in the parking lot of a building owned by him. The letter further requested that Mr. Higginbotham provide this information to his insurance carrier. Mr. Higginbotham did not respond to Mr. Hansen's letter, and he did not send it to his carrier.

On January 22, 2004, Ms. Michelle Grantz, an insurance adjustor and a representative of Firemen's, spoke on the telephone with Mr. Higginbotham. The conversation included a discussion of Ms. Sawyer's accident and injuries. This was the first time that Mr. Higginbotham provided any information to the company regarding the events of December 13, 2002.

## B. *Discussion and Analysis*

In light of the above summary of the facts, it is not necessary for the court to resolve the dispute regarding what knowledge, if any, Mr. Higginbotham had about the accident prior to July 7, 2003. The evidence regarding the two letters that were sent to Mr. Higginbotham by two different attorneys is sufficient for the court to rule that he breached his duty under the policy to provide notice to the company. The facts on which the court's ruling is premised are not disputed, and they strongly support the position taken by Firemen's. Furthermore, the law that applies to these facts weighs heavily in favor of the insurance company.

To begin the explanation for its ruling, the court must first address the language of the policy. Here, in order to invoke the carrier's obligation to provide coverage, the policy required Mr. Higginbotham to notify the company of any "occurrence." Moreover, he had a duty to do so "as soon as practicable." The meaning of this same language was established by the Supreme Court of Virginia in *State Farm Fire & Casualty Co. v. Walton*, 244 Va. 498 (1992). There, the court held that an objective standard must be applied to the duty of the insured to provide notice. The court stated that giving notice as soon as practicable after an occurrence is required for any "incident which was sufficiently serious to lead a person of ordinary intelligence and prudence to believe that it might give rise to a claim for damages covered by the policy." *Id.*, at 504. The objective standard that applies here was also discussed in *Dan River, Inc. v. Commercial Union Ins. Co.*, 227 Va. 485 (1984). There, the court said that the failure to give timely notice "will not be excused when the insured only subjectively concludes that coverage under the policy will not be implicated. Such a policy provision requires the insurer to be notified whenever, from an objective standpoint, it should reasonably appear to the insured that the policy may be involved." *Id.*, at 489.

The court will next address what evidence has been elicited in the present case to demonstrate that Mr. Higginbotham breached his duty under the objective standard that was articulated in *Walton* and *Dan River, Inc.* First, it should be stressed that the information that triggered the duty of the insured in *Walton* to notify his carrier is almost identical to what was available to Mr. Higginbotham in the present case. Specifically, in *Walton*, the insured received a letter from an attorney that told him about the particulars of the claim that was being made. This is exactly what occurred here when Mr. Harkrader sent his letter of July 7, 2003, to Mr. Higginbotham. The *Walton* court found that the insured breached his duty to notify the company when he failed to respond to the attorney's letter. The court explained that, while "there might be some dispute as to whether the duty of notice arose after the sheriff and fire chief interviewed Wade in his mother's presence, there can be little doubt that such a duty arose upon Mr. Hammock's receipt of Meade's letter, which Wade admitted receiving." *Id.*, at 504. Based on the rationale of *Walton*, the court concludes that Mr. Higginbotham had a duty to notify Firemen's when he received the letter from Mr. Harkrader. The undisputed evidence at trial is that he failed to notify his carrier of the occurrence as soon as practicable after he received Mr. Harkrader's letter. The evidence actually proved that he never initiated any contact with Firemen's as a result of the letter.

Other cases support Firemen's argument that Mr. Higginbotham breached his duty by failing to notify his carrier of the occurrence as soon as practicable after he was informed of the incident. For example, in *Liberty Mutual Ins. Co. v. Safeco Ins. Co. of Am.*, 223 Va. 317 (1982), a delay of only fifty-one days in providing notice was sufficient to defeat a claim for coverage. In *Lord v. State Farm*, 224 Va. 283 (1982), a delay of 173 days was found to be a breach of the insured's duty. Furthermore, both the *Safeco* court and the *Lord* court stressed that there were no unusual circumstances that would have affected the ability of the insured to comply with the notice requirements of the policy. In *Lord*, the court pointed out that the insured was not "prevented by his injury, or any other circumstance from personally notifying State Farm seasonably, or from having someone notify the insurer on his behalf." *Id.*, at 288. In *Safeco*, the court observed that there was "no evidence to indicate Blakeney was prevented by reason of health, or other circumstance, from personally notifying Safeco seasonably, or from having someone notify the company for him promptly." *Id.*, at 324. The case before the court features parallel facts. Specifically, Mr. Higginbotham was not ill, indisposed, unavailable, or in any way prohibited from complying with his duty to notify the company under the terms of his policy. He simply elected not to do so.

The final point that must be emphasized by the court is that, in denying coverage, the insurance company is not required to show that it has been prejudiced by the failure of the insured to provide notice of the claim. *State Farm Mutual Ins. Co. v. Porter*, 221 Va. 592 (1980). The Supreme Court of Virginia affirmed this principle in *Walton, supra*, where it stated that "when no notice is given, lack of prejudice is not an issue, and the failure to give the required notice becomes a matter of law." *Id.*, at 504-05.

As a result of the above discussion, the court finds that Mr. Higginbotham breached his duty to provide notice to Firemen's regarding the accident. In reaching this conclusion, the court adopts as part of its rationale the arguments contained in Ms. Manuel's Trial Memorandum. Therefore, Firemen's has no duty to defend or indemnify the plaintiffs with respect to any claim brought against them by Lolita Sawyer for the incident that occurred on the premises of Orange Industrial Park, Inc., on December 13, 2002. This would obviously include the case that is pending for trial.

## II. Issue Two: The Dispute Regarding Whether Hartford Has a Duty To Defend or Indemnify Orange Industrial Park, Inc.

### A. Additional Relevant Facts

The court incorporates by reference all of the facts set forth in the first portion of this opinion. Such facts have been taken into account by the court in its ruling on whether Hartford must provide a defense to Orange Industrial Park, Inc.

Some additional facts must also be considered in resolving the dispute about whether Hartford must defend Orange Industrial Park, Inc. First, in connection with its business, A B & C Group, Inc., used some of the property that was owned by Orange Industrial Park, Inc., for parking and to allow its employees to go to and from its leased premises. Lolita Sawyer was injured on the property of Orange Industrial Park, Inc., in a location that was used by the employees of A B & C Group, Inc., for these purposes. Finally, when Ms. Sawyer was injured, the workers' compensation carrier of A B & C Group, Inc., accepted as compensable her claim for benefits.

### B. Discussion and Analysis

All parties agree that, in order to decide whether Hartford owes any duty to defend under the policy in question, the following language must be interpreted and construed by the court:

> Who is an insured is amended to include as an insured any person or organization with whom you agreed, because of a written contract or agreement or permit, to provide insurance, such as afforded under this policy, but only with respect to your operations, your work, or facilities owned or used by you.

These provisions can be found in the section of the policy that address "Additional Insureds by Contract, Agreement, or Permit."

In asking the court to deny coverage, Hartford vigorously argues that the policy should be confined to incidents that occur only on the premises leased by A B & C Group, Inc. Here, Ms. Sawyer was injured in the parking lot, an area owned by Orange Industrial Park, Inc., and not covered by or included in A B & C Group, Inc.'s lease. Therefore,

Hartford maintains that the above language should not apply to this case and that Orange Industrial Park, Inc., would not be an additional insured under the policy.

The court, however, finds a number of problems with Hartford's interpretation of the policy language. First, the policy nowhere states in explicit terms that coverage for an additional insured is restricted to the leased premises. Second, the language that defines the scope of available coverage does not refer to or even mention the leased premises. Rather, coverage under the policy is tied to "operations," "work," or "facilities owned or *used*." (Italics added).

In the court's view, this language could be completely consistent with circumstances where a business tenant might use some property or facilities that are not actually a part of the tenant's leased premises. Similarly, it could cover a situation where a business tenant might use only a portion of its leased premises. There are many possible situations where the question of whether a party is an additional insured would not necessarily have to be determined based on the location of the leased premises. Insurance carriers are mindful of these types of arrangements, and they lead to policy provisions like the ones before the court. As the Supreme Court of Virginia observed in *Jackson v. North Am. Assurance Society of Va., Inc.*, 212 Va. 177, 179 (1971):

> In construing and interpreting the contract between the parties, it is our function and duty to ascertain and effectuate their lawful intention. In so doing, we should place ourselves in the position of the parties when the contract was made, consider the purposes, the subject matter, and the circumstances under which their minds met.

In light of the above discussion, the court will now analyze the disputed policy language. First, the court finds that the focus should not be on *where* "operations" or "work" were being conducted. Similarly, the precise *location* of all "used facilities" is not dispositive. Rather, the inquiry about whether coverage is available to Orange Industrial Park, Inc., under the policy is governed by the *activity* ("operations," "work," or "facilities … used. . . .") of A B & C Group, Inc., and its employees.

In this context, the court's approach illustrates the problem with the argument made by Mr. Horvath in his Trial Memorandum and his letter of December 29th. He correctly notes that the lease only authorizes A B & C Group, Inc., to engage in certain activities on the leased premises. He also

appropriately stresses that nothing in the written lease agreement allows for the use of the parking lot or other common areas by A B & C Group, Inc.

What the argument fails to consider, however, is that the answer to the coverage question is not found in the language of the written lease between the parties. Rather, the answer lies in the policy language being evaluated by the court. Here, under the policy, the lease between the parties is only relevant to the first part of the disputed clause. Specifically, this part of the clause makes it clear that an additional named insured can include any person "with whom you agreed, because of a written contract or agreement or permit, to provide insurance, such as afforded under this policy. . . ." Nevertheless, once the written document is examined so that any such potential person can be identified, then it is not the written document that next determines whether coverage can be invoked. Rather, the language of the second part of the clause defines the scope of coverage ("operations, your work, or facilities owned or used by you."). Again, as repeatedly stressed, this clause makes no reference to the leased premises.

In this vein, one other aspect of the policy language should be mentioned because it supports the court's view. Specifically, while the language that defines who is a possible additional insured does refer to a written contract, agreement, or permit, the policy does not state that the written document must be a business lease or a landlord/tenant agreement. Rather, the "written contract or agreement or permit" required by the policy must only be one in which the named insured agreed to "provide insurance, such as afforded under this policy. . . ." While many such agreements would in all likelihood be contained in conventional leases, the policy does not state or require that there even be a written lease. The only condition of the policy is that there must be a written contract, agreement, or permit that requires insurance.

Therefore, in light of the above observations, the court finds that the crux of the dispute is whether the injuries to Lolita Sawyer occurred on facilities used by A B & C Group, Inc. On this point, the court applies its common sense to interpret the policy language and the meaning of the word "used." In particular, we find persuasive the reasoning of Mr. Glover on pages 5-6 of his Trial Memorandum. Similarly, as part of its rationale, the court adopts the discussion of the term "use" by Mr. Hansen in his Trial Memorandum and on pages 1-2 of his Reply Brief to Defendant Hartford's Trial Memorandum. Accordingly, the court finds that Lolita Sawyer was injured on facilities used by A B & C Group, Inc. Under the

plain language of the policy, Orange Industrial Park, Inc., is an additional named insured.

Finally, as part of its ruling, the court also cites another important principle of insurance law in Virginia. Specifically, in the event that the court is incorrect in ruling that the plain language of the policy requires Hartford to provide a defense, there is at least some ambiguity regarding how the provisions of the policy should be interpreted. Reasonable minds might reach different conclusions over whether the "facilities … used by you" clause should apply to the present case. Some might agree with the court. Perhaps others would decide that coverage pertains only to the leased premises. Perhaps some would find that "facilities … used by you" would be restricted only to facilities that are specifically connected to the work of the particular business. However, if the policy here is ambiguous, Virginia law still favors the ruling of the court. In particular, when "language used in an insurance policy is susceptible of two meanings, one of which will permit recovery and the other will not, the language should be construed most favorably to the insured." *Jackson, supra,* at 179. On this issue, in *American Fidelity v. Allstate Ins. Co.,* 212 Va. 302, 303 (1971), the court said that "the rule is that, where the language of an insurance contract is susceptible of two constructions, it is to be construed strictly against the insurer and liberally in favor of the insured." Therefore, even if the policy in the present case is ambiguous, it should be construed in favor of the insured, Orange Industrial Park, Inc.

Furthermore, in the context of discussing whether there exists any ambiguity in the policy language, the position taken by Hartford thus far in the litigation merits some comment. Here, it should be noted that, when Ms. Sawyer's complaint was first filed, there was nothing complicated, controversial, or disputed about the location of the incident. Her complaint stated in clear and certain terms that she fell in a parking lot that was owned by Orange Industrial Park, Inc. With full knowledge of this information, the company initially decided that it had a duty to defend Orange Industrial Park, Inc. This was done in a zealous fashion for almost two years. Moreover, the extensive and skillful defense work performed on behalf of Orange Industrial Park, Inc., was done without sending to Mr. Higginbotham any type of reservation of rights notice or letter. Subsequently, however, as the case progressed toward trial, the file was again reviewed by capable, experienced representatives of Hartford. As a result, after a significant amount of pretrial activity had already occurred, a decision was then made to withdraw from the case and to terminate the defense. At the time that Hartford reached this judgment, nothing had

changed about the location of the accident and no additional evidence had been developed or discovered on this point. The company simply studied the same undisputed facts and applied the same policy language. The company then reversed its position on whether it had a duty to defend Orange Industrial Park, Inc.

In pointing out the contradictory positions taken by Hartford, it must be stressed that the court is not suggesting that it can ascertain the specific intent of the company or any of its representatives. To attempt to do so would be to engage in speculation or conjecture. Moreover, the court is not being critical of the company, nor is it questioning the integrity, the ethical conduct, or the professional judgments of any officials or agents. Rather, by noting that the company has espoused opposite views, the court is simply illustrating how the language of the policy might be susceptible to different interpretations. That Hartford has both defended and refused to defend Orange Industrial Park, Inc., supports an argument that the coverage clause contains an ambiguity. As noted previously, Virginia law holds that an ambiguity in such language must inure to the benefit of the insured. This further supports the court's finding that Orange Industrial Park, Inc., is an additional insured under the policy.